In re Mark INNES and Genevieve Innes, Debtors,

Mark Innes and Genevieve Innes, Plaintiffs,

v.

State of Kansas, et al., Defendants,

United States Department of Education, National Student Loan Program p/k/a Nebraska Student Loan Program, Kansas State University, and United Student Aid Funds, Inc., Appellants,

v.

Mark Innes and Genevieve Innes, Appellees.

Bankruptcy No. 95–41486–13.
Adversary No. 95–7104.
Nos. 01–4010–SAC, 01–4011–SAC, 01–4012–SAC, 01–4022–SAC.

United States District Court, D. Kansas.

Aug. 27, 2002.

Brenda J. Bell, Manhattan, KS, for Debtor.

Melanie D. Caro, Kansas City, KS, Mary Kreiner Ramirez, Topeka, KS, Mark J. Schultz, Gallas & Schultz, Kansas City, MO, N. Larry Bork, Nancy L. Ulrich, Topeka, KS, Christopher F. Burger, Cohen, McNeile, Pappas, Leawood, KS, for Defendants.

Nancy M. Caplinger, Topeka, KS, for Counter–Claimant.

CROW, Senior District Judge.

On the joint motion of the appellants, these bankruptcy appeals were consolidated. The appellants timely appeal the bankruptcy court's decision in the adversary proceeding that discharged the debtors' student loans. The appellants elect to have the appeal decided by the district court pursuant to 28 U.S.C. § 158(c)(1)(A). All matters having been fully briefed by the parties and submitted on appeal, the court issues the following as its decision.

**NATURE OF THE CASE**

In 1995, the debtors filed a chapter 7 bankruptcy but later converted it to chapter 13. That same year, the debtor Mark Innes filed an adversary action to have his student loans discharged pursuant to 11 U.S.C. § 523(a)(8)(B) alleging that the repayment would cause undue hardship on him and his dependents. The bankruptcy court initially heard the adversary action in April of 1997 but continued it until closer to the termination of the bankruptcy. (Dk.4, App.Rec.# 72). On April 6, 2000, the bankruptcy court admitted the transcript from the 1997 hearing and conducted another hearing at which the debtors testified, and all parties were given the opportunity to introduce evidence. The parties submitted their post-hearing briefs, and the bankruptcy court issued its decision finding that the student loans were dischargeable.

In this appeal, the defendant United States Department of Education ("DOE") argues that the bankruptcy court erred in holding that the debtor and his dependents would suffer undue hardship if his student loans were not discharged. The DOE contends the bankruptcy court wrongly applied the facts to the relevant standard and ignored undisputed facts in its holding. The National Student Loan Program ("NSLP") also has filed a brief challenging the same holding. The NSLP adopts the DOE's brief and further argues that the bankruptcy court erred in its determination of undue hardship by not considering all of the non-student loan debtor's disposable income provided to the household and by considering possible household expenses attributable to a child who is eighteen years of age or older. The two defendants, Kansas State University and United Student Aid Funds, Inc., have filed briefs that simply incorporate the other defendants' briefs.

**FACTS[1]**

Prior to filing for bankruptcy, the debtor Mark Innes borrowed more than $45,000 in student loans over a number of years. As of April 2000, the interest on these loans had increased his debt an additional $17,000. With these loans, Mr. Innes obtained a bachelor's degree in history but unsuccessfully pursued a master's degree

---

1. The court takes the following facts from the bankruptcy court's findings issued in December of 2000. With the exception of several noted items, these findings have not been disputed by appellants as clearly erroneous.

in the same field. This level of education does not qualify him to teach history at the secondary school level.

Mark and Genevieve Innes are the parents of six children ranging in ages from one to seventeen years of age. Two of the children, the four-year-old and the fifteen-month-old, are not in school, and the other children are in second, sixth, tenth and eleventh grades. The oldest child worked part-time and paid some of his expenses for clothing, auto (including gasoline), and school (except lunches).

When they filed for bankruptcy, Mark was earning $90 per month and Genevieve was working for Wal–Mart. Essentially, Mark was unemployed and unable to find work for an eighteen-month period.[2] The family's needs were met in 1995 by Genevieve's wages and public assistance programs. Mark obtained employment as a locksmith and general maintenance man with a contractor at Fort Riley military base. This employment contract has a five-year term and makes no provision for pay raises. The family's participation in public assistance programs ended with Mark's employment.

As of the bankruptcy proceeding, Mrs. Innes earned $13.44 per hour as a department manager with Wal–Mart for a gross annual income of $28.149. Mr. Innes earned $14.74 per hour for a gross annual income of $30,690.32. Their gross annual incomes include some overtime and combine for a total of $58,839.32 which exceeds by approximately 100% the annual income poverty guideline for a family of eight set by the federal Department of Health and Human Services. Neither spouse has any reasonable expectation of receiving any-

thing more than a cost-of-living increase in the future. Based on their employment histories, the future is unlikely to include substantially better-paying jobs. Mrs. Innes testified her retirement fund at work may be worth as much as $100,000, but her pay stubs did not document any deduction for this fund. She also purchases $20 of Wal Mart stock bi-weekly and her employer adds to her purchase of stock with an additional $3.00.

The debtors' net monthly take home pay (including a monthly allotment for any projected income tax refund) after required deductions for payroll taxes and additional deductions from Genevieve's pay for life, disability, health and dental insurance and for the purchase ($40 per month) of Wal Mart stock is $3,842.04. The debtors' monthly expenses total $4,327.47.[3] These monthly expenses are approximately $320 more than the Internal Revenue Service's "Collection Financial Standards" which set nationwide allowances for certain monthly expenses based on family size and income level. The bankruptcy court found that the debtors' actual expenses reasonably exceed these standards, because the standards fail to account for such typical expenses as medical and dental care, recreation, charity, daycare, and care for Mark's leg and prosthesis. The bankruptcy court further found that "[o]ther than their transportation operating costs, the debtors' reported expenses do not exceed the amounts allowed for the items that are included in the standards, and a number of their expenses are substantially less." (Bkcy. Ct's Order, p. 8).

The debtors live in the country which lowers their house payments but increases their transportation expenses. During the

---

**2.** Mark wears a below-the-knee prosthesis which limits his ability to perform some strenuous physical labor.

**3.** The appellants take issue with certain expenses as not supported by the evidence. The court will address those arguments individually later in the order.

chapter 13 bankruptcy case, the debtors were allowed to use one year's tax refund to convert their garage into another bedroom and to use a portion of another year's tax refund to pay repairs to their septic field. Because their home continues to need substantial repairs and they lack the funds to make them, the debtors have borrowed and will continue to borrow small amounts of money. Also during the chapter 13 case, the debtors paid off their vehicles, wore them out, and replaced them with used vehicles. Mr. Innes presently drives a 1985 Honda with 225,000 miles and uses it to commute daily 100 miles round trip to his job. Mrs. Innes drives a 1995 Ford Windstar that had 60,000 miles when she purchased it. She drives about 30,000 miles per year with most miles logged on her daily commutes to work. The debtors are making monthly payments on the Windstar.

As a benefit of Mrs. Innes's employment with Wal Mart, the debtors have health insurance with a $1,000 annual deductible, a 20% co-pay requirement for covered services, and 100% percent coverage after meeting the $4,450 co-pay limit. Mark's below-the-knee amputation requires ongoing medical care. He has a bone spur that should be surgically removed, his prosthesis is replaced occasionally at a cost of $5,000, and his wearing of the prosthesis requires disposable sleeves costing about $1,500 per year. He also had been diagnosed with bipolar disorder and prescribed Prozac for this condition. At the time of the hearing, Mark has been successful in controlling this condition without medication.

Much of the debtors' 1999 tax refund was used to pay for a Colorado family vacation during which they economized by eating out infrequently. For most meals, the family eats canned vegetables and

fruit, rather than fresh, and they usually eat hamburger as the meat in their meals.

Following the hearing, the parties supplied possible payment schedules under different repayment plans, but they did not report whether Mr. Innes actually was eligible for those plans. These different plans presented the following payment options: (1) $459.66 monthly for 30 years; (2) $514.60 monthly for a maximum of 25 years with any remaining balance discharged and treated as taxable debt forgiveness; or (3) $750.45 monthly for 10 years.

## STANDARD OF REVIEW

■ The court reviews the bankruptcy court's findings of fact for clear error. *In re Pena*, 155 F.3d 1108, 1110 (9th Cir. 1998). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "Review under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 603, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). The court reviews "de novo the bankruptcy court's application of the legal standard in determining whether a student loan debt is dischargeable as an undue hardship." *In re Rifino*, 245 F.3d 1083, 1087 (9th Cir.2001) (citation omitted); *see In re Woodcock*, 45 F.3d 363, 367 (10th Cir.1995) (whether a student loan is dischargeable under the undue hardship exception is a question of law reviewed de novo), *cert. denied*, 516 U.S. 828, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995).

## RELEVANT LAW

■ The Bankruptcy Code creates a presumption making student loans non-

dischargeable in the absence of undue hardship to the debtor or the debtor's dependents. 11 U.S.C. § 523(a)(8)(B).[4] This provision "was enacted to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation thereby absolving themselves of the obligation to repay their student loans." *In re Hornsby*, 144 F.3d 433, 437 (6th Cir.1998). The burden of proving an undue hardship rests with the debtor. *In re Woodcock*, 45 F.3d at 367. The debtor must carry this burden by a preponderance of evidence. *In re Brightful*, 267 F.3d 324, 327 (3rd Cir.2001).

Because the Bankruptcy Code does not define "undue hardship," the courts "have crafted numerous definitions." *In re Woodcock*, 45 F.3d at 367. The Tenth Circuit has not adopted any specific test or definition of undue hardship in this context. *Id.* In *Woodcock*, the bankruptcy court applied each of the different tests to the facts and found that the debtor had not proved "undue hardship," the district court agreed, and the court of appeals simply affirmed the denial of discharge. *Id.* The "[c]ourts universally [have] require[d] more than temporary financial adversity and typically stop short of utter hopelessness." *In re Hornsby*, 144 F.3d at 437.

Most of the circuits have settled on the three-pronged test established in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2nd Cir. 1987). *See, e.g., Goulet v. Educational Credit Management Corp.*, 284 F.3d 773,

777 (7th Cir.2002); *In re Brightful*, 267 F.3d 324, 327 (3rd Cir.2001); *In re Rifino*, 245 F.3d 1083, 1087 (9th Cir.2001); *In re Kasey*, 187 F.3d 630, 1999 WL 507274 (4th Cir. Jul.19, 1999) (Table). The bankruptcy court here, as have other bankruptcy courts in this district and circuit, applied the *Brunner* test. *See, e.g., In re Hollister*, 247 B.R. 485, 490 (Bankr.W.D.Okla. 2000); *In re Coats*, 214 B.R. 397, 402 (Bankr.N.D.Okla.1997); *In re Lindberg*, 170 B.R. 462, 464–65 (Bankr.D.Kan.1994); *In re Cooper*, 167 B.R. 966, 969 (Bankr. D.Kan.1994). To have his student loans discharged under this test, a debtor must prove:

> (1) that the debtor cannot maintain based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loan.

*Brunner*, 831 F.2d at 396. The debtor must prove all three elements, and the failure to prove any one element terminates the court's inquiry and results in a finding of no dischargeability. *See In re Rifino*, 245 F.3d at 1087–88.

Instead of adopting a single test, the Sixth Circuit looks at many factors, including those factors identified in *Brunner*, but also considering such other things as,

---

**4.** The version of this statute applicable to this case provides in relevant part:

"(a) A discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental

unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

. . . .

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8)(B).

" 'the amount of the debt ... as well as the rate at which interest is accruing' and 'the debtor's claimed expenses and current standard of living with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents." *In re Hornsby,* 144 F.3d at 437 (quoting *In re Rice,* 78 F.3d 1144, 1149 (6th Cir.1996)). A debtor "need not live in abject poverty before a discharge is forthcoming." *Id.* at 438. (citation omitted). The Sixth Circuit also quoted the recommendation from one bankruptcy court that "[w]here a family earns a modest income and the family budget, which shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists from which a debtor may be discharged of his student loan obligations." *Id.* (quoting *In re Correll,* 105 B.R. 302, 306 (Bankr.W.D.Pa.1989)).

Relying on *In re Andrews,* 661 F.2d 702 (8th Cir.1981), the Bankruptcy Appellate Panel for the Eighth Circuit Court of Appeals has used the totality of circumstances test:

> The Eight Circuit's opinion in *Andrews* resulted in a test for undue hardship under § 523(a)(8) that requires an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources; (2) calculation of the debtor's and his dependents' reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding that particular bankruptcy case. *Id.* The Eighth Circuit's *Andrews* case, while not a finely detailed test as those pronounced in *Brunner* or *Frech,* is the authority in this circuit on the matter of undue hardship discharge under § 523(a)(8).
>
> Moreover, the *Andrews* test is less restrictive and less narrow, yet it maintains the essential core considerations. For example, the *Frech* test asks whether and to what extent the debtor received benefit from his or her education financed by the loans sought to be discharged. We think that, absent unique circumstances, this inquiry would ordinarily be irrelevant. On the other hand, it may speak to a debtor's future earning capacity. The *Brunner* test extends the issue of the debtor's ability to repay to the term of repayment of the loan. We think this limitation may not be appropriate in every case.
>
> . . . .
>
> The test for undue hardship binding bankruptcy courts in the Eighth Circuit is that held by the Court of Appeals in *Andrews.* We interpret *Andrews* to require a totality of the circumstances inquiry with special attention to the debtor's current and future financial resources, the debtor's necessary reasonable living expenses for the debtor and the debtor's dependents, and any other circumstances unique to the particular bankruptcy case.

*In re Andresen,* 232 B.R. 127, 139–40 (8th Cir. BAP 1999).

▮ The strict three-pronged test articulated in *Brunner* and applied by most circuits is certainly consistent with the policy interests behind the Code's narrow exception to discharge for student loans. On the other hand, the approaches taken in the Sixth and Eighth Circuits accommodate the consideration of other factors that appear both reasonable and relevant in determining undue hardship but that appear in *Brunner* to have been either excluded or marginalized at best. Because the Tenth Circuit has yet to decide which test and/or which factors are involved in an undue hardship determination, this court will look to the *Brunner* factors but also will borrow any other relevant considerations identified by the Sixth and Eighth

Circuits which are supported by the facts and circumstances in this case.

## ISSUES AND ANALYSIS

*Do the debtors and their dependents currently enjoy a more than minimal standard of living and could continue enjoying the same if Mark Innes was required to repay his student loans?*

 To meet this first prong, "the debtor must demonstrate more than simply tight finances." *In re Rifino,* 245 F.3d at 1088. "In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness." *Id.* (quoting *In re Nascimento,* 241 B.R. 440, 445 (9th Cir. BAP1999)). "[A] minimal standard of living includes what is minimally necessary to see that the needs of the debtor and his dependents are met for care, including food, shelter, clothing, and medical treatment." *In re Nary,* 253 B.R. 752, 763 (N.D.Tex.2000). Simply put, it is living "within the strictures of a frugal budget in the foreseeable future." *In re Ritchie,* 254 B.R. 913, 918 (Bkrtcy.D.Idaho 2000).

The DOE and other appellants attack many of the bankruptcy court's findings concerning the debtors' expenses, but they fail to show any of those findings to be clearly erroneous. As reflected in its order and in the record submitted on appeal, the bankruptcy court carefully considered the evidence and crafted findings fully supported by the evidence. The defendants'

efforts to have this court now evaluate the debtors' testimony and interpret the evidence differently are not persuasive. The court has no definite or firm conviction that the bankruptcy court committed any error in its findings. With that said, the court will discuss only some of the defendant's specific attacks.[5]

As explained in her testimony, Ms. Innes calculated the amount of childcare expenses by taking the standard weekly charge and multiplying it by the number of weeks that she would have the children in daycare due to her work. Ms. Innes further explained that the actual amounts appearing in her ledger did not always match the standard weekly charge, because that particular daycare provider did not charge when the children were absent for illness or when the provider was not able to care for the children. Ms. Innes also testified that she was looking for a new daycare provider and that she expected the new provider would charge more and would not suspend fees for those days when a child missed for sickness. The bankruptcy court's finding that the debtors' childcare expenses are reasonable and necessary is fully supported by the evidence.

Though the monthly medical expenses reported in the debtors' ledgers averaged $270 per month for the first ten months of the year, the bankruptcy court found that the debtors' projected medical expenses of $306 to be a reasonable estimate of the

---

5. The court will make some quick observations about three of those challenged expenses. In making its undue hardship determination, the bankruptcy court did not include the monthly expense for a replacement prosthesis and found that the debtors' reasonable monthly expenses exceeded their take-home pay even without this prosthesis expense. The defendants are unable to show any error in that finding. The defendants concede that some life and disability insurance is reasonable here in light of the number of dependents, but they contend the additional monthly expense of $100 for life insurance is excessive. There is no evidence to suggest that the amount of life insurance associated with this amount of monthly premium, considering the number of dependents, would be excessive or unreasonable. As for the recreation expense, the bankruptcy court found that the debtors' expenditures while excessive for smaller families is reasonably necessary for a family of eight. This court concurs with that conclusion.

family's out-of-pocket medical expenses. (Bkcy. Ct's Order, p. 17–18). The bankruptcy court observed that the $306 is less than the monthly average of what the debtors would have to pay under the maximum annual deductible and co-pay liability for services covered under the family's health insurance policy. In addition, the bankruptcy court agreed that medical expenses were particularly difficult to forecast for a family of eight that has two younger children. The court finds no error in the bankruptcy court's findings and conclusions on the reasonableness of the debtors' estimated monthly medical expenses.

The defendants ask the court to judge the debtors' credibility and reject their testimony on actual expenses concerning such costs for transportation and food and on the need and cost for home maintenance. The defendants further argue the court should reject the debtors' estimates of these expenses as unreasonable and the debtors' expense statement as unreliable. The bankruptcy court made findings on these matters, and the evidence of record is sufficient to sustain them. That the defendants would have liked more documentation from the debtors is not a valid reason in itself for rejecting those findings as clearly erroneous.

The expenditures with which the defendants take issue and label as unnecessary, excessive, discretionary or luxury items do nothing to elevate the debtors' lifestyle beyond the minimal standard of living. To call any of those expenditures unreasonable would mean that families living at the minimal standard of living should not be able to afford to give their children modest Christmas gifts, to take a single frugal summer vacation, to use tax refunds or obtain loans for the purpose of repairing their sewer and converting their garage into a necessary bedroom, to participate in an employer's stock purchase program at the bi-weekly rate of $20, to join a weekly bowling league as the only form of recreation for the parents, to have their children participate in school band, or to support their children by attending their school sporting events. The court would agree with the defendants that plaintiffs may have made one or more purchases in those categories of expenses that exceed what most would consider as frugal budgeting. Even so, the court is confident that the elimination of those expenses would still show a deficit in the debtors' budget.

The defendants challenge the bankruptcy court's ruling that "some minimal [charitable] contribution must be permissible under § 523(a)(8)." (Bkcy. Ct's Order, p. 13). The bankruptcy court discussed the relevant case law and recognized "that the RLCDPA's [Religious Liberty and Charitable Donation Protection Act of 1998] specific percentage protection for contributions is probably not applicable under § 523(a)(8)," but the court was "convinced it would be incongruous to exclude all voluntary religious or charitable contributions from the undue hardship test when Congress has adopted such a generous standard for the disposable income test under § 1325(b)(2)(A)." *Id.* The court believes it need not rule on this issue, because the $60 monthly charitable contribution has such a de minimis effect here on the analysis of undue hardship. *See In re Lebovits,* 223 B.R. 265, 273 (Bkrtcy.E.D.N.Y.1998); *But see In re Ritchie,* 254 B.R. at 920 n. 12 (not condoning but recognizing that analysis may be unnecessary when the charitable contribution has a de minimis effect on the undue hardship determination). For that matter, the court finds that the debtors' monthly amount of charitable contributions appears modest and reasonable under the circumstances. *See In re Cline,* 248 B.R. 347, 351 (8th Cir. BAP 2000); *In*

*re Meling,* 263 B.R. 275, 279 (Bkrtcy. N.D.Iowa 2001).

The bankruptcy court rejected the defendants' argument that once a debtors' child turns eighteen years of age then a court may no longer consider any of the expenses associated with that child in determining undue hardship. The bankruptcy court questioned any assumption that a child immediately becomes self-supporting upon turning eighteen. Taking a practical viewpoint, the bankruptcy court observed, as have other courts, that many undergraduate college students are still dependent on their parents. "In this case, the Court believes it would be unreasonable to pretend that all six of the Inneses' children will achieve self-sufficiency at eighteen, and will instead assume it is likely that the debtors will have to continue to provide at least some of their support for another year or two, and possibly even more." (Bkcy. Ct's Order, p. 21). The bankruptcy court also noted that the defendants have no real basis for objecting should Mrs. Innes wish to support her adult children and, in particular, to assist them in paying for college. The bankruptcy court reasoned that though a parent's expenses should not be subject to an automatic cutoff date for a child reaching the age of eighteen, the reasonableness of considering those expenses should depend upon more circumstances than just the age of the child. Finally, the bankruptcy court noted "that many of the debtors' expenses will not be reduced just because one of their children leaves home; only food, clothing, and recreation seem certain to go down." (Bkcy. Ct's Order, p. 21–22).

The facts of this case do not require this court to decide whether a child's expenses should no longer be considered in the undue hardship determination upon the child reaching the age of eighteen. First, none of the debtors' children have reached the age of majority. Second, the evidence of record does not show that upon their oldest two children turning eighteen the debtors will realize a significant change in their expenses or disposable income. The debtors' current budget only includes part of their oldest son's expenses, because he uses income from his part-time job to pay for his clothes, half of his car insurance, gas for his car, and his school expenses except for lunch. (Dk.145, pp. 82–83). The defendants do not contend and have not briefed that the income earned by the non-student loan debtor or spouse should not be available to pay some portion of an adult child's college expenses. As the bankruptcy court correctly concluded, the defendants simply cannot justify any argument for imposing such a spending restriction on Mrs. Innes's income which is one-half of the family's income. "Furthermore, no matter how Mr. Innes's spending for the children's support should be restrained, Mrs. Innes ought to be able to help them pay for any higher education they may wish to pursue, especially so that they might be less likely to wind up in Mr. Innes's present predicament." (Bkcy. Ct's Order, p. 21). Finally, the debtors' four other children will not be turning eighteen for some time, and the evidence does not show that the debtors' expenses for food, clothing and recreation will decrease to a level that the debtor's family will be able to maintain a minimal standard of living while making his student loan payments.

Though generally agreeing with the proposition found in most reported decisions that the non-debtor spouse's income is to be considered when determining undue hardship, the bankruptcy court questioned whether the non-debtor spouse must "apply all his or her income to the family's basis necessities so that the debtor spouse's income can be applied to the student loan debt to the maximum possible

extent." *Id.* at 22. The bankruptcy court summarized its review of the case law:

> Where the non-debtor spouse has a substantial income that supports a comfortable lifestyle or significant discretionary purchases of luxury items, courts have sometimes considered more of that spouse's income to be available to supply basic necessities, making more of the debtor's income available to pay the student loans. *See White*, 243 B.R. at 508–14. Another court has suggested (in the context of determining whether a pension benefit was reasonably necessary for the support of the debtor and dependents so that it would be exempt under § 522(d)(10)(E)) that a spouse's income should only be considered to the extent of one-half the couple's common expenses and all that spouse's personal expenses to avoid depriving the debtor's creditors of an appropriate share of the debtor's income and to avoid making a self-sufficient debtor into a dependent of the spouse. *In re Velis*, 123 B.R. 497, 512 (D.N.J.), *rev'd in part on other grounds sub nom., Velis v. Kardanis*, 949 F.2d 78 (3rd Cir.1991).
>
> The Court believes that the non-debtor spouse's income should be applied to that spouse's fair share of the family expenses. In addition, luxury items should be excluded from the expense equation. Support of non-minors, however, can be included in allowable expenses, depending on the circumstances. *[In re] Gonzales*, 157 B.R. [604] at 609–10 [(Bankr.E.D.Mich.1993)].

(Bkcy. Ct's Order, p. 22–23). In short, the bankruptcy court considered all of Mrs. Innes's income (approximately one-half of the family's income), applied her income to one-half of the family's basic expenses, and permitted her to use remaining income to meet reasonable and appropriate non-luxury expenditures.

The defendants contend the bankruptcy court ignored the case law and did not include all of Mrs. Innes's income in the undue hardship analysis. As summarized above, the bankruptcy court did not reject the case law but simply questioned how that rule should be applied to the facts in this case. The defendants do not come forth with any decision that resembles this one and reaches a different result. The defendants rely largely on *In re White*, 243 B.R. 498 (Bkrtcy.N.D.Ala.1999), which comes closest to addressing the issue here:

> This Court agrees, and finds as a matter of law that Ms. White's income should be considered in deciding whether Mr. White is able to pay his student loans and maintain a minimal lifestyle.
>
> . . . .
>
> But the debtor counters by arguing that even if Ms. White's income is considered, that income should be considered only to the extent of Ms. White's agreed share of the Whites' combined living expenses. If not, the debtor argues further, Ms. White will, in effect, be forced to help shoulder Mr. White's student loan debt by being required to pay more than her fair share of living expenses, while that portion of Mr. White's income which ordinarily would be devoted to the payment of his share of living expenses is diverted to student loan creditors. The debtor concludes that since the family's combined living expenses are high (and Mr. White's entire salary is presently consumed by his agreed share of their living expenses) any diversion for the benefit of student loan creditors would penalize Ms. White.
>
> Again, the Court disagrees. The baseline from which to measure is a "minimal lifestyle." The debtor's argument is based on the White's actual lifestyle, which is a very comfortable lifestyle, rather than the "minimal" lifestyle envi-

sioned by *Brunner*. What Mr. White's "fair share" of a comfortable lifestyle is not relevant to the *Brunner* equation. 243 B.R. at 510–12 (footnote omitted). In a footnote to this discussion, the court in *White* recognized the potential merit to this argument when considered in the context of the non-student loan debtor spouse's contribution "to the common fund, in relative proportion to" that spouse's income. The court followed this analysis through and found that Ms. White's income was three times larger than Mr. White's and that the same conclusion results, that is, "Mr. White can repay his student loan obligations and afford at least a minimal lifestyle while doing so." 243 B.R. at 512 n. 15. "Using the theoretical pro rata living expense contribution analysis, the Whites would be able to enjoy more or less an average lifestyle even if Mr. White has to repay his student loans." *Id.*

█ Unlike the Whites, the Innes contribute almost equally to the family's income and their necessary and reasonable family expenses already exceed their combined family income without considering Mr. Innes's payments on his student loan debts. Unlike Mr. White, Mr. Innes bases his argument on a minimal lifestyle for his family of eight and what is his fair share of it. On the sheer weight of these factual differences alone, the holding and rationale in *White* is distinguishable and inapplicable. This court is persuaded that the bankruptcy court's findings and conclusions in this regard are not inconsistent with precedent but simply ascribe appropriate weight to the facts unique to this case. The court does not believe the case

law cited by the defendants supports a blanket application of the general rule that fails to account for circumstances unique to individual cases. On the facts of this case, the bankruptcy court correctly considered all of Ms. Innes's disposable income and applied the proportionate share of her income to the family's essential or basic living expenses.[6] "To require her to do more would essentially force her (or her children) to pay debts for which she is not liable and support Mr. Innes while being denied the right to apply some of her income to reasonable non-luxury items, such as the children's education, and a modest retirement fund." (Bkcy. Ct's Order, p. 24). Even assuming Ms. Innes were required to pay more than her proportionate share of the family's expenses, Mr. Innes and his dependents could not afford to make the monthly payments on his student loan debt. *Id.*

█ For all of the above reasons, the court is satisfied the debtors have carried their burden of proving that based on current income and expenses Mr. Innes and his dependents could not maintain a minimal standard of living if Mr. Innes were forced to repay his student loans. The court agrees with the bankruptcy court's conclusions:

> Even if insurance will pay for Mr. Innes's replacement prosthesis and Mrs. Innes's entire income is available for paying the student loans, their combined net incomes do not currently exceed their projected reasonable expenses at all, much less by anything close to the $460 or more per month that would have to be paid to service the debts. There is

---

**6.** In their opening briefs, the defendants addressed only Ms. Innes's income and did not refer to her pension as being part of any disposable income to be considered in the undue hardship analysis. In its reply brief, the defendant NSLP argues her pension funds

are disposable because she was able to borrow against them. The court declines to address this argument first advanced in the defendants' reply brief. *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n. 5 (10th Cir.1999)

no reason to expect this situation to change significantly until at least three of the debtors' children have left home and become self-supporting. If the contested items deducted from Mrs. Innes's pay are properly allowable, the family would even more clearly suffer undue hardship if the student loans must be repaid.

(Bkcy. Ct's Order, p. 19). Neither the debtor nor his family must live in abject poverty to be entitled to relief under § 523(a)(8). *In re Hornsby*, 144 F.3d at 438. When the debtors' average monthly expenses exceed or nearly match their net income, as here, the debtors clearly cannot maintain a minimal standard of living and pay off the student loans. *See In re Pena*, 155 F.3d at 1113.

*Do additional circumstances indicate that the state of affairs, that is, the debtors' family's inability to maintain a minimal standard of living if the debtor were forced to repay the loan, is likely to persist for a significant portion of the repayment period of the student loans?*

 This factor entails proof " 'of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time.' " *Goulet*, 284 F.3d at 778 (quoting *Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993)). "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.' " *Brunner*, 831 F.2d at 396. Though "any precise prediction of . . . future earnings and expenses is necessarily speculative," a debtor must point to such indicators as family dependents, medical problems, or limited education and skills that would lead a court "to believe he [the debtor] will lack the ability to repay

for several years." *Roberson*, 999 F.2d at 1137.

The defendants contend the circumstances show the debtors' financial affairs have improved and will continue to improve. They point to the older children reaching the age of eighteen and the younger children no longer needing childcare. The defendants also highlight the debtors' ability to pay off several debts, to make home improvements, and to take a vacation during the bankruptcy.

Based on the evidence of record, the bankruptcy court concluded:

Here, the Inneses will, for much of the foreseeable future, probably have reasonably necessary expenses equal to or greater than their incomes. Meanwhile, interest on Mr. Innes's student loan debts will continue to accrue at between $4,000 and $5,000 per year. The evidence indicated that the Inneses are not likely to experience anything more than cost-of-living wage increases in the future. By the time their children have grown up and become self-supporting, the debts, already large, will have grown substantially. Even at the lowest monthly payment rate now available, assuming he would qualify for it, Mr. Innes could not repay the loans before he reaches retirement age. In any event, the Inneses cannot currently afford even that lowest payment, and will probably not be able to afford it before several of their children have become independent. In fact, by the time their expenses might fall sufficiently for them to pay $460 or more per month toward the loans, the debt to be serviced will be approaching $100,000. It will be six years before three of the Inneses' six children have reached the age of majority, and will probably be at least that long before the youngest of those three is self-supporting. Consequently, it will

also be at least that long before the Inneses would even possibly be able to begin making the required payments on the loans. Their ability to pay the loans then will exist, if at all, only if they are still married, healthy, and employed, and only if all of Mrs. Innes's income is devoted to helping Mr. Innes retire the student loan debts.

(Bkcy. Ct's Order, p. 25–26).

The court agrees with the bankruptcy court's findings and conclusions about the Inneses' financial problems persisting for a significant period. The evidence shows no real likelihood of increased income other than the nominal cost-of-living increases. If anything, there is a risk of Mr. Innes again facing unemployment, as his five-year contract of temporary employment comes to an end. As for debts being paid off, the debtors have incurred new ones and continue to face the ongoing prospect of additional loans to purchase replacement vehicles and to make necessary home repairs. The defendants' arguments on certain expenses immediately ending upon the children turning eighteen are addressed above. Though childcare expenses will come to an end soon enough, it can be expected that expenses in other categories such as food, clothing and recreation will increase as the younger children age. Even assuming a financial improvement after the two oldest children become self-supporting and childcare expenses end, the evidence simply does not show the debtor's ability to service the substantial amount of student loan debt that would have accrued by that time. The court finds that the debtor has established additional circumstances indicating his continuing inability to repay his student loan debt.

*Has the student-loan debtor made a good faith effort to repay the loans?*

 "This factor recognizes that '[w]ith the receipt of a government-guaran-teed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses.' " *Goulet,* 284 F.3d at 779 (quoting *Roberson,* 999 F.2d at 1136). Because debtor's conduct is evaluated "in the broader context of his total financial picture," a finding of good faith is not precluded by the debtor's failure to make a payment. *In re Nary,* 253 B.R. at 768. Indeed, "failure to make even minimal payments on student loans does not prevent a finding of good faith where the debtor never had the resources to make payments." *In re Ritchie,* 254 B.R. 913, 922 (Bkrtcy.D.Idaho 2000) (quotation and citation omitted). " '[U]ndue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his control.' " *In re Faish,* 72 F.3d 298, 305 (3rd Cir.1995) (quoting *Roberson,* 999 F.2d at 1136), *cert. denied,* 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996).

The defendants complain that Mr. Innes has made no attempt to repay any of the student loans even though the debtors' income has increased during the bankruptcy. Because the debtors have spent this additional income in meeting other expenses, the defendants contend Mr. Innes is unable to establish good faith.

The evidence of record fully sustains the bankruptcy court's finding that the debtors have not had sufficient income prior to and during the bankruptcy to make the minimum monthly payments of approximately $460. Throughout this same period, Mr. Innes has made good faith efforts and succeeded for the most part in obtaining temporary employment, maximizing his income, and minimizing his expenses and those of his family. Nor is there any evidence that Mr. Innes willfully or negli-

gently caused his own default on these student loans. The court finds that the circumstances of this case satisfy the good-faith prong.

IT IS THEREFORE ORDERED that excepting Mr. Innes's student loan debts from the chapter 13 discharge would cause undue hardship on him and his family and that these debts are discharged under the applicable version of § 523(a)(8);

IT IS FURTHER ORDERED that the bankruptcy court's memorandum of decision filed December 22, 2000, is affirmed.