IN RE: Paula Maxine **EDWARDS**, Debtor.

Paula Maxine Edwards, Plaintiff,

v.

Navient Solutions, Inc. and U.S. Department of Education, Defendants.

Case No. 15–22113–7
Adversary No. 15–6100

United States Bankruptcy Court, D. Kansas.

Signed November 22, 2016

850

Martin J. Peck, Wellington, KS, for Plaintiff.

David Alan Gellis, Manz Swanson Hall Fogarty & Gellis, Kansas City, MO, Christopher Allman, U.S. Attorney's Office, Kansas City, KS, for Defendants.

**Memorandum and Opinion Discharging Non–Stafford Portion of Navient Solutions, Inc. Student Loans**

Janice Miller Karlin, United States Chief Bankruptcy Judge

This adversary proceeding is before the Court on Plaintiff/Debtor Paula Maxine Edwards' complaint to discharge a portion of the student loans she owes Navient Solutions, Inc. (Navient) under 11 U.S.C.

§ 523(a)(8).[1] That statute generally states that educational loans are excepted from a Chapter 7 discharge unless the debt imposes "an undue hardship on the debtor and the debtor's dependents."

The Court conducted a trial and is now prepared to rule. Because the Court finds that Debtor has carried her burden to show repayment of the loans would create an undue hardship on her and her family, as required by § 523(a)(8), the Court grants judgment to Debtor, discharging the non-Stafford portion of the loans she owes Navient.

## I. Background and Findings of Fact

Debtor filed her Chapter 7 bankruptcy petition in October 2015, and received her discharge in March 2016. At the time of filing, she had no secured debt, but scheduled nearly $188,000 of unsecured debt. Of this total, she claims about $151,000 in student loans. Prior to the trial on the claim against Navient, the Court granted summary judgment to the U.S. Department of Education ("DoEd") on Debtor's § 523(a)(8) claim against it, deciding for several reasons that the almost $72,000 of Debtor's student loans owed to the DoEd were not dischargeable. One of the key reasons for this finding was that DoEd offers a repayment plan (with a debt forgiveness component). The plan requires very small monthly payments, based on income, and Debtor agreed she could make the small payments.[2]

Debtor admitted at trial that she has very recently been accepted into an income based repayment program for those loans, and understands her monthly payment will be somewhere between $20 and $115; the precise amount has not been determined.

---

1. All future references to title 11 will be to code section only.

2. See Doc. 58 in this Adversary Proceeding, Order Granting Summary Judgment to Department of Education.

The DoEd represented to the Court in its summary judgment motion—unopposed on this point—that Debtor would likely need to only pay approximately $21 a month so long as her current income and household size remained constant. The payment would increase, after the annually required certification, if her income increases or her expenses decrease as a result of a reduction of family size or for any other reason.[3]

Debtor is a thirty six year old single mother of two daughters who are fifteen and six years old. Neither Debtor nor her children suffer from any physical or mental disability or illness. She receives some child support from the father of her older child when he is working (about $200 a month), but receives none from the father of her younger child and does not expect to receive any. In an attempt to maximize her income, she has supplied information to child support collection personnel to aide in collecting support from him, but her efforts have been unsuccessful.

At the time she filed her bankruptcy, Debtor was driving a twelve year old car and had no car payment. Recently, however, the struts and transmission went out on that car and she needed to replace it. She apparently did not have the money for a down payment, as her parents both co-signed the note and loaned her the $1500 down payment required to purchase the used 2013 Nissan Altima. The car cost $14,700, and her monthly payments are $237.

In addition to now having a car payment, her car insurance increased; she testified it went from $53 per month to $119 per month.[4] Because she had not predicted this increase in her vehicle insurance, Debtor tried to lower her monthly car payment by dropping the extended warranty she purchased with the car. When she learned it would not lower her payments (instead merely shortening the length of her loan), she did not pursue that option.

Debtor is in her fourth year as an elementary school teacher. She incurred her student loans while pursuing a bachelor's degree in education from Newman University. She chose Newman University, a private college, despite its higher cost of attendance, because it offered a program with evening classes that allowed her to complete her degree while working full time so she could support her (then only) child. She used her student loans for tuition, books, and to pay living expenses not paid with her earnings as a paraprofessional. She did not study abroad or take any classes unnecessary to her degree.

Debtor's annual salary is $35,300 for work performed during all but approximately 2 months a year. The income and expense schedules she filed with her petition indicate that she nets $2699.77 in income each month (consisting of $2085.69 net salary, $183 child support, and $431.08 in amortized tax refunds[5]) and $2698.33 in

---

3. *Id.* at pp.4–5 ("The REPAYE plan was instituted in December 2015 and is the most flexible repayment plan available under the Direct Loan Program. Payments under REPAYE are generally ten percent of discretionary income, and after twenty years of repayment at this rate, the remaining balance on undergraduate loans is forgiven under the plan." "Under the REPAYE plan, therefore, Debtor's repayment amount would be adjusted annually, based on her then income and family size.")

4. Debtor's Schedule J at filing showed vehicle insurance of $90 per month, so the increase is only $19 higher than budgeted, assuming this is the only vehicle Debtor insures.

5. This estimate is based on the fact Debtor received tax refunds of $5173 and $5179 for tax years 2014–2015, which averaged equals approximately $5176, or about $431 a month if amortized over 12 months. Debtor testified that she uses her tax refunds throughout the year, after receipt, to pay expenses as they

expenses, leaving a net balance of $1.44. Her expenses include $500 a month for rent, $170 a month for cable, cell phones, and internet, $950 a month for food and housekeeping supplies for her household of three, and $150 a month for entertainment.

Regarding her food and housekeeping budget, Debtor testified that she and her daughters used to eat out two to three times a week, depending on her older child's sports schedule. But she has already had to reduce this expense due to the added car and insurance expenses, and due to increased gas and maintenance expenses she now incurs due to her daughter borrowing her grandfather's old pickup truck since recently reaching driving age.

Regarding her entertainment budget, Debtor testified that she takes only one vacation a year—an annual vacation to Branson with her extended family, which has been a family tradition since her childhood. Although her parents pay for all lodging and food, she estimates her expenses are approximately $500 to $700 for tickets to a show and an amusement park. This appears to be the only real luxury for this family.

Another exhibit admitted at trial showed that she actually has higher expenses in some categories than she included on her expense schedule. The largest discrepancy (besides those related to the car purchase) is for medical/dental expenses. She estimated $0 for medical/dental on Schedule J, but Exhibit 4 showed she had actually spent $2,106 for health related expenses in

2015 (in addition to the cost of health insurance). That would equal approximately $175/month in expenses for which she budgeted zero. This appears a reasonable expense for a family of this size (while the $30/month cost of health insurance reflected on Schedule J appears quite low).

Prior to filing her bankruptcy petition, Debtor's wages were being garnished (or threatened by garnishment) by two creditors, including the DoEd[6] and Discover Bank, and two other creditors had recently taken judgment against her—Asset Acceptance LLC, Bank of America, and Capital One Bank. Those garnishments stopped upon filing of her bankruptcy, and Debtor's monthly income and expenses are now fairly stable, at least while collection on her student loans remains at bay.

As noted above, Debtor testified to some changes to her income and expenses since filing. First, her annual salary increased by $200, due to the lock-step pay scale for teachers in her district.[7] But as previously noted, her expenses have increased far more than her salary; her expenses as of November 2016 are as much as $450 a month higher than she reflected on Schedule J when she filed bankruptcy a year earlier (at least $20 to DoEd, $237 car payment, $19 increased car insurance, and $175 in uninsured medical expenses).

Debtor also testified extensively about the dim prospects for future income increases in her profession, due to no fault of her own. Unless she returns to school for graduate classes (an expense her budget

---

arise. She has never used her refund to make payments on her student loans.

**6.** Exhibit 6 showed that DoEd was preparing to garnish 15% of Debtor's disposable pay every pay period. Kansas law allows even a higher rate. *See* K.S.A. § 60–2310 (Kansas wage garnishment statute, which allows garnishment of 25% of aggregate disposable income). If those creditors pursued those gar-

nishments, 15% of Debtor's $2,699 disposable income would equal $404 per month and 25% would be $674 per month.

**7.** Despite testifying at length about the lock-step salary schedule her school uses, the Court remained confused about why she was not earning $35,700 instead of $35,300 due to her 4 years of service.

shows no ability to fund), her salary is capped by her school district's pay scale at $35,700 per year, only $400 more than she's making now. Debtor has considered moving to a school with a higher pay scale, but she credibly testified that even if she could find a higher paying position elsewhere, it was not feasible at this point in her life and would not likely net more after additional expenses. She and her extended family live in the same town and they help her with childcare and transportation. She has the same school breaks/holidays as her children by teaching in the same school district where her daughters attend school, which helps to minimize childcare costs for those school breaks. In addition, she is able to secure affordable housing in her small town (paying only $500 a month for a small three bedroom home) while keeping transportation expenses low because of her minimal commute.

Debtor is working in the very field in which she obtained her degree, and she is unaware of any realistic way to increase her income. Although she does not work during the eight to nine week summer break from teaching, she credibly testified that for now, childcare costs would be offset against the limited income she could earn during the summer, assuming she could consistently find a job. She has taught summer school in the past and testified she may do so in the future.

Debtor's exhibits show Debtor's lengthy loan history. She took out her first student loans in 2001 and 2002. She then borrowed significant amounts each year between 2004 and 2008. Debtor ultimately consolidated her federal student loans in 2012. In addition to the approximately $72,000 nondischargeable debt she owes the DoEd,

Debtor owes $56,640.15 to Navient for "tuition answer loans," and $8,354.93 to Navient for Stafford loans.[8] Debtor testified she is not seeking discharge of the Stafford loans held by Navient, as the school where she works is a "Title 1" school and she understands that after a certain number of years teaching at a Title 1 school, those loans will eventually be forgiven. This is yet another reason Debtor has elected to remain in the Wellington School District and at her particular school.

The exhibits also show that Debtor attempted to make some payment arrangement with Performant Recovery on her DoEd loans in June 2015. She also included as exhibits several examples of handwritten notes from telephone calls referencing "Navient," "Fed. Default," or "Loan Rehabilitation." But these handwritten notes are undated, and it is unclear how extensive were her attempts to make payment arrangements and on which loans. Debtor freely admits her confusion as to who she owes on which student loans, or who owns or services which loans—a complaint this Court frequently hears.

The exhibits do show that since Debtor's tuition answer loans from Navient were initially disbursed in December 2007 and January 2008, Debtor made one payment of $365.05 in April 2009, and then made $150 payments in July, August, and September 2010. No other payments have been made on these Navient tuition answer loans, and Debtor presented no additional evidence that she made any payment or attempted to negotiate a repayment arrangement for the last six years. Her only other effort to repay student loans due Navient was her decision to teach at a

---

8. The parties stipulated that all Debtor's loans with Navient total $65,837.53. The totals shown in the exhibits, however, do not match that amount ($56,640.15 + $,8354.93 in Stafford loans = $64,995.08). The Court cannot explain the discrepancy in the total numbers, but because the differential is small, the exact balance is immaterial to the analysis.

Title 1 school and to remain there until her Stafford loans can be forgiven.

Based on the exhibits provided by Debtor, if Debtor were to remain on the "Standard Billing" payment method with the "Full Principal and Interest" payment plan, her monthly payment on the Navient tuition answer loans would equal $314.75. This figure may be dated, however, as the interest rate on these loans is 9.75%, and the exhibit containing those amounts appear to be from 2015. While no witness explained the terms "Standard Billing" or "Full Principal and Interest," some elementary math shows that the repayment term is 15 years ($30,005 ÷ $166.69 = 180 months/15 years, and $26,653.62 ÷ $148.06 = 180 months/15 years). In addition, no evidence was presented that any alternate repayment plans are available to Debtor on these private student loans as was the case with the DoEd loans.[9]

Debtor testified that in addition to paying the small amount she expects to pay to DoEd under its repayment plan, she would likely be able to pay $50 a month toward her Navient loans, but not as much as $100 a month. She testified that she does not believe she can ever repay the total amount owed to Navient.

## II. Conclusions of Law

An adversary proceeding to determine the dischargeability of particular debts is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court may exercise subject matter jurisdiction.[10]

Although a Chapter 7 discharge is generally designed to be a relatively quick method of discharging debts and providing debtors a fresh start, there are certain debts that Congress decided would not be dischargeable. Under § 523(a)(8), a Chapter 7 discharge does not discharge debts for educational loans[11] "unless excepting such debt from discharge ... would impose an undue hardship on the debtor and the debtor's dependents." The Bankruptcy Code does not define the phrase "undue hardship."

The Tenth Circuit, however, has adopted the three-part *Brunner* test for analyzing whether a debtor has shown that his or her student loan debt should be discharged because it would cause undue hardship.[12] Under this test, the debtor bears the burden of proving, by a preponderance of the evidence: that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of liv-

---

9. "Private student loans are funded by banks, not the government, and banks are not required to offer the same alternatives to struggling borrowers as federal loan servicers. Unlike federal student loans, private student loans generally do not offer repayment plans contingent on a borrower's income, meaning that private student loan debtors facing even a temporary hardship are often unable to negotiate affordable repayment plans with their lenders." Anne E. Wells, *Replacing Undue Hardship with Good Faith: An Alternative Proposal for Discharging Student Loans in Bankruptcy*, 33 Cal. Bankr. J. 313, 324 (2016) (internal citations omitted).

10. 28 U.S.C. § 157(b)(1) and § 1334(b).

11. Specifically, educational loans are:

(A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

There is no dispute that the Navient loans fall within this definition.

12. *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004).

ing for herself or her dependents if forced to repay the loans; that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and that the debtor has made good faith efforts to repay the loans.[13]

■ If the court finds the debtor has failed to prove any of the three *Brunner* elements, the inquiry ends and the student loan is not dischargeable.[14] Importantly, and as noted by the Tenth Circuit Bankruptcy Appellate Panel in *Alderete v. Educ. Credit Mgmt. Corp.,*[15] the Tenth Circuit "makes it clear that it disdains 'overly restrictive' interpretations of this test, and concludes that it should be applied to further the Bankruptcy Code's goal of providing a 'fresh start' to the honest but unfortunate debtor."[16] In addition, regarding nondischargeability proceedings generally, "exceptions to discharge are narrowly construed, and because of the fresh start objectives of bankruptcy, doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor."[17]

### A. Debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans.

■ This Court has had prior occasion to apply the *Brunner* test. In *Buckland v. Educational Credit Management Corp. (In re Buckland),*[18] the Court assessed whether the debtor carried his burden to show that his student loans should be discharged because they would cause undue hardship. Regarding the first prong of the *Brunner* test, the Court stated:

> The first prong of the *Brunner* test requires Debtor to demonstrate more than simply tight finances. The Court requires more than temporary financial adversity, but typically stops short of utter hopelessness. A minimal standard of living includes what is minimally necessary to see that the needs of the debtor and [his] dependents are met for care, including food, shelter, clothing, and medical treatment. Further, a court should also be hesitant to impose a spartan life on family members who do not personally owe the underlying student loan, particularly when those family members are children.[19]

■ Debtor's evidence on the first prong of the *Brunner* test is convincing. Debtor's realistic budget demonstrates it is difficult for her to cover her reasonable living expenses now, without making any payment to Navient. Her monthly income of $2699.77 relies on amortizing her anticipated tax refund, which has been in the $5,000 range the last two years (likely due to the earned income credits[20] that Debtor receives as the single parent of two minors). This Court is well aware that refunds vary year to year and low income

13. *Id.* at 1309–10.

14. *Id.* at 1307.

15. *Alderete v. Educ. Credit Mgmt. Corp.,* 308 B.R. 495 (10th Cir. BAP 2004) (internal quotation omitted).

16. *Id.* at 503.

17. *DSC Nat'l Properties, LLC v. Johnson (In re Johnson),* 477 B.R. 156, 168 (10th Cir. BAP

2012) (internal quotations and alterations omitted).

18. 424 B.R. 883 (Bankr. D. Kan. 2010).

19. *Id.* at 889 (internal quotation marks and citations omitted).

20. Kan. Stat. Ann. § 79–32,205 (Kansas earned income tax credit).

families often use them to catch up on bills that have become delinquent since the last tax refund was received, or to deal with unexpected expenses that often arise with children, vehicles, or healthcare.

Because Debtor's expenses have increased since filing due to her need to purchase a reasonable replacement vehicle (and her omission of other expenses in her budget), it is difficult to see on paper how Debtor is presently covering those higher expenses even with no payment on her student loans. Although Schedule J showed a $1.44 monthly balance after expenses, as noted above, Debtor's realistic expenses are now as much as $450 a month higher. Debtor testified one way she is trying to handle these additional expenses is by reducing her food budget (including eating out), which was admittedly high when she filed bankruptcy.

Ultimately, the Court finds Debtor cannot meet basic food, shelter, transportation, clothing, and medical treatment needs of herself and her two children if she has to pay any amount to Navient now. Even if Debtor stopped spending the $500 to $700 she has spent in the past on her annual family vacation, and totally eliminated her entertainment budget, she would still be unable able to make the Navient student loan payment.

Debtor also apparently has nothing saved for an emergency, and no line item in her budget for even minimal savings she might need in the event of any blip in her health or her children's health, or for any other emergency that might arise. She even had to borrow $1,500 from her parents to buy a used replacement car—a necessity, and apparently could not obtain the loan without their co-signature. As a result of all these facts, Debtor has met her burden to show that, given her current income and expenses, she cannot maintain a minimal standard of living while repaying her student loans to Navient.

**B. Additional circumstances exist indicating Debtor's state of affairs is likely to persist for a significant portion of the repayment period of the student loans.**

 Regarding the second prong of the *Brunner* test, this Court in *Buckland* stated:

> The second prong of the *Brunner* test, which requires that additional circumstances exist indicating that the Debtor will be unable to repay the loans while maintaining a minimal standard of living for a significant portion of the repayment period, properly recognizes that a student loan is viewed as a mortgage on the debtor's future. However, the debtor need not show a certainty of hopelessness. Instead, the Court must take a realistic look into the debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like.[21]

When it adopted the *Brunner* test, the Tenth Circuit explained the reasoning behind this second prong. "The reason for this requirement is simple: A recent graduate's salary might be so low that it is difficult to pay the loans now, but it is clear that his salary will increase in the future and therefore his loans should not be discharged."[22] First, regarding Debtor's income, as noted above, because of her chosen profession and its low pay scale, it

---

21. *Buckland,* 424 B.R. at 889–90 (internal quotation marks and citations omitted).

22. *In re Alderete,* 412 F.3d 1200, 1205 (10th Cir.2005). *See also Polleys,* 356 F.3d at 1306 (noting that "Section 523(a)(8) was designed to remove the temptation of recent graduates to use the bankruptcy system as a low-cost method of unencumbering future earnings.")

is highly unlikely Debtor's salary will increase significantly in the future, if at all, since she does not have the resources to return to school. And even if she did, her school district's pay scale only minimally rewards those efforts.

Second, the Navient loan documents suggest the repayment period on the Navient loans is 15 years. What does Debtor's future hold, on the expense side, over the next 15 years? While it is likely her 15 year old will leave her care at some point in the next several years, the $200 child support that she has received, off and on, for this child will also likely terminate—perhaps only 3 years from now when she turns 18. In addition, Debtor will be unable to claim the older daughter as a dependent on her tax return at some point, reducing the tax refund on which she now relies to try to meet expenses. Many of Debtor's expenses are fixed, regardless of family size, such as her car expenses. So it is completely uncertain whether Debtor's expenses will be reduced significantly enough to the point where she can start repaying this loan once her older child is no longer dependent on her.[23]

Her younger daughter is only 6, meaning Debtor will likely support that child for the entire duration of these loans—at least for the vast majority of the repayment period. Because the Court has found Debtor has no ability to realistically pay anything to Navient now, because it also has found Debtor's income is not likely to increase, and because there is no prospect for reducing her expenses until her older daughter leaves the home, this would leave Debtor paying almost nothing on these loans for several years.

In addition to the reasons given above for this Court's conclusion that Debtor's state of affairs is likely to persist for a significant portion of the repayment period of the student loans, if we assume the best case scenario for Navient—that this is one of those rare cases where a mother would have no need or desire to continue providing any support the moment her child turns 18 (three years from now)—we know Debtor would then owe at least $56,600 at 9.75% interest (and likely several thousand more due to interest accruals). Assuming the 15–year repayment period reflected in the trial exhibits, she would only have 12 years to repay the loan. Simple math would show that she would need to pay $668 a month to retire $56,600 at 9.75% interest over the remaining years of the loan repayment period.[24] Again, this as-

---

**23.** *See Innes v. State of Kansas (In re Innes),* 284 B.R. 496 (D. Kan. 2002) (agreeing with bankruptcy court, which "rejected the defendants' argument that once a debtors' child turns eighteen years of age then a court may no longer consider any of the expenses associated with that child in determining undue hardship. The bankruptcy court questioned any assumption that a child immediately becomes self-supporting upon turning eighteen. Taking a practical viewpoint, the bankruptcy court observed, as have other courts, that many undergraduate college students are still dependent on their parents."). *But see Alderete,* 412 F.3d at 1205 (affirming finding of the bankruptcy court that as debtors "children reach the age of majority, [debtors] will have less strain on their family budget," but not addressing debtors' fixed expenses that will

not change when their children reach the age of majority).

**24.** The Court here merely consulted amortization tables. *See O'Toole v. Northrop Grumman Corp.,* 499 F.3d 1218, 1225 (10th Cir. 2007) (discussing Federal Rules of Evidence 201(b)'s standards for judicial notice and stating "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web). Also, the Court believes it just as likely that Debtor would try to support her daughter through college, given how long it took her to get through college and given the financial situation she now faces due in part to taking out large student loans to get her degree. If one assumes Debtor would support her daughter even through age 21, or 6 years from now, that would leave 9

sumes no interest would accrue on that $56,600 during the 3 years she cannot realistically make payments, which is assuredly not the case. Even if Debtor could pay $50 a month on the student loans, as she thought might be possible, and devote the $500 to $700 she spends each year on her family vacation, these payments would not even retire the interest accruing on these loans. She will thus owe much more in 3 years than she owes today, with essentially the same salary but without the child support or income tax credit for her older daughter.

This Court's experience, coupled with a review of Debtor's expenses, does not reflect that a reduction of one child would result in a net savings anywhere close to the (at least) $668 a month payment that would then likely be required on the Navient loans. But far more important, the Court knows from the evidence received in the DoED portion of the case that Debtor's repayment obligation to DoEd (on the $72,000 nondischarged loan) will increase under the REPAYE program over the next 20 years if her expenses decrease. Similarly, in the even more unlikely event that her income increases, again, Debtor's monthly payment to DoEd under the REPAYE program will likewise increase. And while there is no evidence how much her DoEd payment would increase, there is no reason to expect Debtor will have excess disposable income for a significant portion of the repayment period on the Navient loans. Accordingly, the Court finds Debtor has carried her burden to show that her state of affairs is likely to persist for a

significant portion of the repayment period of the student loans.

## C. Debtor made good faith efforts to repay the loans given her limited income.

■■■ Regarding the third prong of the *Brunner* test, the Court in *Buckland* stated:

> The third prong of the *Brunner* test requires the Court to determine if the debtor has made a good faith effort to repay the loan as measured by his or her efforts to obtain employment, maximize income and minimize expenses. The inquiry into a debtor's good faith should focus on questions surrounding the legitimacy of the basis for seeking a discharge. A finding of good faith is not precluded by a debtor's failure to make a payment. Undue hardship encompasses a notion that a debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his control.[25]

In other words, the inquiry for the third prong is not necessarily limited to the amount or number of payments a debtor has made, but instead, to an analysis whether the debtor has made a good faith attempt to repay the loan by maximizing income and minimizing expenses.[26]

■■■ Admittedly, Debtor has not made any payments on the Navient loans in the last 6 years—coincidentally the age of her youngest daughter and thus the number of years she has been supporting her second child without help. Her only payments were in 2009 and 2010. Admittedly, she elected not to use significant tax refunds to

years of the 15–year repayment period, requiring $789/month to Navient on the $56,600 balance (and that assumes no interest would accrue during those 6 years). Alternatively, if she somehow got another 15–year repayment period, she'd have much more than $56,600 to repay, still at 9.75% interest.

**25.** *Buckland*, 424 B.R. at 889–90 (internal quotation marks and citations omitted).

**26.** *Polleys*, 356 F.3d at 1309.

make a payment, even a minimal amount. And while there are some exhibits showing she made some efforts to contact Navient, she did not supplement those exhibits with much testimony.

But this Court has previously held that a finding of good faith is not precluded by a debtor's failure to make payments,[27] and that rationale applies here, too. Debtor did demonstrate to the Court's satisfaction that she was really unable to make anything but a de minimis payment, if at all, on her student loans during the last six years. In addition to these very substantial student loans owed to Navient and DoEd, she listed $37,000 in other debt when she filed this bankruptcy, and was facing garnishments from at least two creditors and judgments from two others. And while it would be better for her case had she paid even $10 a month from her tax refunds, in light of her life situation—attempting to raise two children on her own with very little child support, and with a small income even given her teaching degree—her minimal efforts should qualify under the totality of her circumstances. There was no evidence she willfully or negligently caused her own default, and the Court does not believe she did.

This Court's finding on this third element is also buttressed by Debtor's decision to work in a Title 1 school. Debtor testified one reason she remains at her school is that the Stafford component of the Navient student loans (which she does not seek to discharge herein) will be forgiven at some point. While making monetary payments would have been very difficult for this Debtor in light of her financial situation, she is effectively helping retire a part of her student loans by teaching at this school. So she is not trying to simply wipe her hands clean of all her student loan obligations. Her decision to remain at a Title 1 school should count for something, and this Court finds that this fact helps her meet the requirement that she made good faith efforts, in light of her financial circumstances, to repay the loans she owes Navient.

While it is true that Debtor spent $500–$700 a year during her extended family's long-standing family vacation, the Court does not find that this expenditure alone should disqualify Debtor from discharging over $56,000 in student loans. As the Tenth Circuit has noted, "the good-faith requirement 'should not be used as a means for courts to impose their own values on a debtor's life choices.' "[28] And as this Court has previously held, a court should be "hesitant to impose a spartan life on family members who do not personally owe the underlying student loan, particularly when those family members are children."[29] As this was the only evidence of any "excess," and because it is not much of one, the Court elects not to punish Debtor's two children because she made the choice to incur so much debt for an education that would likely not provide remuneration sufficient to repay the debt.

As this Court noted in *Junghans v. William D. Ford Federal Direct Loan Program (In re Junghans)*,[30] this Debtor also has little hope for increased income, through no fault of her own. She has consistently held a job since she obtained her teaching degree, and she has made reason-

---

27. *Also see Innes*, 284 B.R. 496 at 506 (holding that because a debtor's conduct is evaluated "in the broader context of his total financial picture," a finding of good faith is not precluded by the debtor's failure to make a payment).

28. *Alderete*, 412 F.3d at 1206 (quoting *Polleys*, 356 F.3d at 1310).

29. *Buckland*, 424 B.R. at 889.

30. No. 01–41733, 2003 WL 23807971 (Bankr. D. Kan. May 13, 2003).

able efforts to maximize income and minimize expenses. This Court has already found her $72,000 in DoEd student loans are nondischargeable, meaning she will likely have no disposable income with which to pay these Navient loans during the repayment period of those loans. In other words, her failure to make more payments stems only from fact that she has found herself in a severe financial situation, not because of any attempt to evade payment.

## III. Conclusion

The Court found Debtor to be an honest and hardworking individual who appears to be doing her best to provide for her family—not a debtor attempting to abuse the bankruptcy system. Because the Tenth Circuit disdains "overly restrictive" interpretations of the *Brunner* test, because the test should be applied to further the Bankruptcy Code's goal of providing a 'fresh start' to the honest but unfortunate debtor, and because exceptions to discharge are to be narrowly construed, the Court finds under these facts that the statutory exception must be resolved in Debtor's favor. Debtor's § 523(a)(8) claim again Defendant Navient is granted, and the two tuition answer loans owed to Navient are discharged.

**It is so Ordered.**